# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 45716

STATE OF IDAHO,

        Plaintiff-Respondent,

v.

CHRISTOPHER T. SHANAHAN,

        Defendant-Appellant.

)
)
)
)
)
)
)
)
)

Boise, May 2019 Term

Opinion filed: July 11, 2019

Karel A. Lehrman, Clerk

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Jefferson County. Alan C. Stephens, District Judge.

The judgment of the district court is <u>affirmed</u>.

Ferguson Durham PLLC, Boise, for Appellant. Craig H. Durham argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondent. Kenneth K. Jorgensen argued.

---

MOELLER, Justice.

## I. NATURE OF THE CASE

Christopher T. Shanahan appeals from a district court decision denying his motion to correct an allegedly illegal sentence imposed in 1997. Shanahan argues that his indeterminate life sentence, with the first thirty-five years fixed, for a murder he committed as a juvenile in 1995 is equivalent to a life sentence without the possibility of parole. Therefore, he asserts that under *Miller v. Alabama*, 567 U.S. 460 (2012) and persuasive precedent from other states, he is entitled to a new sentencing where his youth and its attendant characteristics may be properly considered. Otherwise, he argues, his sentence violates the Eighth and Fourteenth Amendments to the U.S. Constitution. The district court denied the motion on the basis that *Miller* is inapplicable to Shanahan's sentence and, even if it applied, the sentencing court heard testimony regarding his age and mental health prior to sentencing him. For the reasons stated below, we affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In the Fall of 1995, Shanahan and two friends devised a scheme to rob a convenience store in Grant, Idaho, and use the money to travel to Las Vegas, Nevada. Once there, they

planned to join a gang and lead a life of crime. Shanahan was fifteen years old at that time.

The day before the robbery was to occur, Shanahan explained the plan to other friends and said that, if necessary, he would shoot the store clerk. He apparently believed that killing someone would lend itself to his initiation into a gang. In an effort to dissuade him from his intended course of action, some of his friends offered him money for the trip to Las Vegas, but he refused.

The next day, Shanahan and two friends obtained guns, ammunition, gloves, and gas cans from their homes and Shanahan drove them to the store. Before entering the store, they discussed each person's role and Shanahan agreed that he would shoot the clerk.[1] After waiting for two people to leave the store, Shanahan signaled to one of his friends to enter. His friend's role was to distract the clerk so that she would not activate any alarms. Shanahan then put on gloves, so as not to leave fingerprints, and entered the store with a .22 caliber sawed-off rifle.[2] Inside, he joined his friend who was in the aisle next to where the clerk, Fidela Tomchak, was stocking a beverage cooler. From there, Shanahan positioned himself behind a rack of potato chips approximately three feet from Mrs. Tomchak, lifted the rifle, lowered it briefly, and then lifted it again and shot her in the back of the head, killing her. Although he later denied that his action was racially motivated, he referred to Mrs. Tomchak as a "Mexican bitch" while talking with his friends the night before he shot her. After killing her, Shanahan went to where her body lay, looked at her, and then proceeded to scan the store for witnesses, whom he testified he would have also killed. Upon finding no one else in the store, Shanahan went to the cash register, removed just over $200, stole some cigarettes, and ran out of the store. The three boys then drove to Las Vegas.

The boys' plan fell apart shortly after they arrived when one of them became homesick and they decided to return to Idaho together. However, while driving back, they were stopped in Utah and arrested. One of Shanahan's friends confessed to the crimes, and as a result, Shanahan was charged with first degree murder and robbery with a sentencing enhancement because he used a firearm in the commission of the crimes. Shanahan pled guilty to the charges in exchange for the State dismissing the enhancement, agreeing not to seek the death penalty,[3] and

---

[1] The sentencing court concluded that he was determined to kill the clerk even if it were unnecessary to do so.

[2] Shanahan and one of the other boys sawed the barrels off the guns and test-fired them before going to the store.

[3] As a fifteen-year-old, Shanahan was not eligible for the death penalty under *Thompson v. Oklahoma*, 487 U.S. 815 (1988); however, at the time of his plea, the sentencing court, as well as Shanahan's counsel, apparently believed

recommending concurrent sentences. Shanahan then filed a motion seeking to be sentenced pursuant to the Juvenile Corrections Act. Given the egregious nature of his crimes, the motion was denied. At sentencing, the trial court considered a presentence investigation report and heard testimony from Mrs. Tomchak's husband, daughter, step-son, and the lead investigator on the case, as well as from Shanahan's mother, sister, and friends. Additionally, two mental health experts testified about Shanahan's psychological profile, which included evidence that he was significantly immature for his age, struggled from his parents' divorce and his father's emotional absence, and was susceptible to peer influences.

After extensive fact-finding, the district court "focused primarily on the age of the defendant in determining the death penalty was not an appropriate sentencing option." In its analysis of the potential for Shanahan's rehabilitation, the district court found that due to his young age, there was hope that he could "eventually become a contributing member of society." However, given the heinous nature of the crime committed, the district court sentenced Shanahan to concurrent unified life terms with thirty-five years fixed for the murder and ten years fixed for the robbery. Shanahan subsequently filed a motion to reduce his sentence pursuant to Idaho Criminal Rule 35. The court denied the motion.

On his first appeal, Shanahan argued that the district court abused its discretion in declining to sentence him as a juvenile, that his sentence amounted to cruel and unusual punishment, and that even if his sentences were not cruel and unusual, they were an abuse of discretion. The Court of Appeals rejected all of Shanahan's arguments and affirmed the district court's decision. *See State v. Shanahan*, 133 Idaho 896, 994 P.2d 1059 (Ct. App. 1999).

In June 2017, over twenty years after he was originally sentenced, Shanahan filed a motion to correct an illegal sentence pursuant to I.C.R. 35(a) on the basis that his sentence violates the Eighth and Fourteenth Amendments to the U.S. Constitution in light of *Miller v. Alabama*, 567 U.S. 460 (2012) (as made retroactive by *Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016)), which held that sentencing courts must consider a juvenile's youth and its attendant characteristics before imposing a sentence of life in prison without the possibility of parole. The State objected on the basis that *Miller* does not apply because Shanahan was not sentenced to life without the possibility of parole, or its functional equivalent. On November 28, 2017, the district

that he was. Whether this misunderstanding of the law, to the extent it contributed to his decision to plead guilty, constitutes ineffective assistance of counsel or reversible error is not an issue Shanahan has raised on appeal.

court issued a memorandum decision denying Shanahan's motion. The court noted that, to the extent that the sentencing court considered Shanahan's age and mental health as factors weighing against imposing the death penalty, such consideration was improper, as Shanahan was not eligible for the death penalty as a minor. Nonetheless, it denied the motion on the basis that, even if *Miller* applies to Shanahan's indeterminate life sentence, the sentencing court heard and properly considered testimony regarding Shanahan's age and mental health before sentencing him. Shanahan timely appealed.

### III.    STANDARD OF REVIEW

Idaho Criminal Rule 35(a) "is a narrow rule which allows a trial court to correct an illegal sentence or to correct a sentence imposed in an illegal manner" at any time. *State v. Draper*, 151 Idaho 576, 601, 261 P.3d 853, 878 (2011). "Generally, whether a sentence is illegal or whether it was imposed in an illegal manner is a question of law, over which we exercise free review." *Id.*

### IV.    ANALYSIS

This appeal presents an issue of first impression in Idaho: whether a juvenile offender convicted of homicide who receives an indeterminate life sentence with a long fixed term is entitled to a sentencing hearing at which the factors enunciated in *Miller* are considered. This appeal also presents the issue of whether such a sentence, independent of *Miller*, amounts to cruel and unusual punishment in violation of the Eighth Amendment. Shanahan argues that since he was sentenced in 1997, material changes in constitutional law concerning the sentencing of juvenile offenders render the fixed portion of his sentence unconstitutional. He also argues that, pursuant to the Equal Protection Clause of the Fourteenth Amendment, he is entitled to a hearing at which his youth and its attendant characteristics are considered when sentencing him.

In *Miller*, the Supreme Court considered whether state sentencing schemes that mandate life in prison without the possibility of parole for juvenile homicide offenders violate the Eighth Amendment's prohibition against cruel and unusual punishment. 567 U.S. at 489. After reflecting upon a line of cases in which the Court determined that "children are constitutionally different from adults for purposes of sentencing," the Court concluded that, "[b]ecause juveniles have diminished culpability and greater prospects for reform . . . 'they are less deserving of the most severe punishments.' " *Id.* at 471 (quoting *Graham v. Florida*, 560 U.S. 48, 68 (2010)). Specifically, the Court stated:

> *Graham*, *Roper*, and our individualized sentencing decisions make clear that a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory-sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment.

*Id.* at 489. Accordingly, before sentencing a juvenile to life without the possibility of parole, *Miller* requires consideration of the defendant's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.* at 477. In addition, a sentencing court must "tak[e] into account the family and home environment that surrounds [the juvenile] . . . from which he cannot usually extricate himself—no matter how brutal or dysfunctional," as well as "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him." *Id.* The Supreme Court also lamented the fact that mandatory life without parole sentencing schemes "ignore[] that [the juvenile] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." *Id.* at 477–78.

However, the U.S. Supreme Court declined to impose a categorical bar on life-without-parole sentences for juveniles convicted of homicide. *Id.* at 479. Rather, *Miller* only requires a sentencing court to consider the juvenile's "youth and attendant characteristics" before sentencing him to life without the possibility of parole. *Id.* at 483. Yet, in this regard, the Court also noted that:

> [G]iven all we have said . . . about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between "the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Roper*, 543 U.S. at 573; *Graham*, 560 U.S. at 68. Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

*Id.* at 479–80.

5

*Miller* also clarified that if a juvenile's crime reflects unfortunate yet transient immaturity, " '[a] State is not required to guarantee eventual freedom,' but must provide 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " *Id.* at 479 (quoting *Graham*, 560 U.S. at 75).

Four years after *Miller* was decided, the Supreme Court of the United States announced that *Miller* applies retroactively and expounded upon its requirements:

> *Miller* . . . did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of "the distinctive attributes of youth." *Miller*, 132 S. Ct. at 2465. Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects " 'unfortunate yet transient immaturity.' " *Id.* at 2469 (quoting *Roper*, 543 U.S. at 573). Because *Miller* determined that sentencing a child to life without parole is excessive for all but " 'the rare juvenile offender whose crime reflects irreparable corruption,' " *Id.* (quoting *Roper*, *supra*, at 573), it rendered life without parole an unconstitutional penalty for "a class of defendants because of their status"—that is, juvenile offenders whose crimes reflect the transient immaturity of youth. *Penry*, 492 U.S. at 330. As a result, *Miller* announced a substantive rule of constitutional law. Like other substantive rules, *Miller* is retroactive because it " 'necessarily carr[ies] a significant risk that a defendant' "—here, the vast majority of juvenile offenders—" 'faces a punishment that the law cannot impose upon him.' " *Schriro*, 542 U.S. at 352 (quoting *Bousley v. United States*, 523 U.S. 614, 620 (1998)).

*Montgomery v. Louisiana*, 136 S. Ct. 718, 734 (2016). Thus, life-without-parole sentences are barred under *Miller* and its progeny unless the juvenile's crime reflects irreparable corruption.

Applying these principles of law, we address Shanahan's arguments in turn.

**A.     Although *Miller* does not expressly apply to Shanahan's indeterminate life sentence, under our holding in *Windom*, its rationale extends to determinate sentences that are the functional equivalent of a life sentence.**

As previously discussed, *Miller* only expressly prohibits mandatory sentencing schemes that impose a determinate life sentence on a juvenile offender who is convicted of homicide. 567 U.S. at 487. However, we have since applied *Miller* to non-mandatory sentences of life without the possibility of parole for juvenile homicide offenders. *Windom v. State*, 162 Idaho 417, 423, 398 P.3d 150, 156 (2017), *cert. denied*, 138 S. Ct. 977 (2018). Shanahan did not receive either a mandatory or non-mandatory determinate life sentence. Instead, he received an indeterminate life sentence with the possibility of parole after thirty-five years. As a result, neither *Miller* nor our extension thereof in *Windom* expressly apply to the indeterminate portion of Shanahan's

6

sentence. Nevertheless, we are persuaded that *Miller* still has some application to the determinate or fixed portion of a juvenile's sentence. In this case, that would be the thirty-five years of fixed time Shanahan received. As we explained in *Windom*, "[a]lthough it is possible that the [Supreme] Court intended *Miller* to be applied retroactively only to those juveniles who were given mandatory sentences of life without parole, that reading would be inconsistent" with the Supreme Court's declaration that *Miller* rendered life in prison without the possibility of parole " 'an unconstitutional penalty for a class of defendants because of their status—that is, juvenile offenders whose crimes reflect the transient immaturity of youth.' " 162 Idaho at 423, 398 P.3d at 156 (quoting *Montgomery*, 136 S. Ct. at 734).

We acknowledge the dissent's concern that application of *Miller* to an indeterminate life sentence would "expand" the Supreme Court's holding in *Miller* because, according to the dissent, *Miller* only applies to fixed (*i.e.*, determinate) life sentences. The dissent's strict application of *Miller* focuses too narrowly on how a sentence is characterized and disregards the Supreme Court's admonition in *Miller* that states must provide "some meaningful opportunity" for release from prison where a juvenile's crime reflects transient immaturity. *Miller*, 567 U.S. at 479 (quoting *Graham*, 560 U.S. at 75). To provide a hyperbolic example, it could not reasonably be argued that a 100-year fixed sentence would provide a meaningful opportunity for release, even though it is not technically a fixed life sentence. In essence, we recognize that at some point on the sentencing spectrum, a lengthy fixed sentence equates to a fixed life sentence. Because the Supreme Court has "counsel[ed] against irrevocably sentencing [juveniles] to a lifetime in prison" without consideration of the *Miller* factors, 567 U.S. at 480, we conclude that the rationales of *Miller* and *Windom* also extend to lengthy fixed sentences that are the functional equivalent of a determinate life sentence, regardless of whether such sentences are characterized as indeterminate life sentences or otherwise.

Accordingly, we must consider whether Shanahan's indeterminate life sentence, with the first thirty-five years fixed, is the functional equivalent of life without the possibility of parole.

**B.      Shanahan's sentence does not violate either the Eighth or Fourteenth Amendment under *Miller* because it is not the functional equivalent of a determinate life sentence.**

Shanahan argues that under *Miller*, as made retroactive by *Montgomery*, his sentence of life with thirty-five years fixed is the equivalent of a life sentence and that it constitutes a cruel and unusual punishment under the Eighth Amendment because he was not given consideration of

the *Miller* factors at sentencing. He also argues that, without consideration of the *Miller* factors, he is being treated differently than similarly situated individuals who received a life sentence without the possibility of parole, which he asserts is a violation of the Equal Protection Clause of the Fourteenth Amendment.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments." U.S. CONST. amend. VIII. Where a punishment is grossly disproportionate to a crime, the Eighth Amendment is violated. *Graham*, 560 U.S. at 72. For purposes of evaluating whether a sentence violates the Eighth Amendment, this Court "treat[s] the fixed portion of a sentence as the term of confinement." *State v. Matteson*, 123 Idaho 622, 626, 851 P.2d 336, 340 (1993). The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV.

As noted previously, the rationale of *Miller* applies to life sentences without the possibility of parole and their functional equivalents. 567 U.S. at 479–80. In essence, Shanahan argues that his indeterminate life sentence of life with thirty-five years fixed is the functional equivalent of a determinate life sentence because it is lengthy in terms of his age when he was sentenced (fifteen) and because "the risk is unacceptably high that [he] will die in prison without being given the opportunity for release." He also argues that he is in a class of juvenile offenders whose crimes reflect transient immaturity and that all other members of that class will receive consideration of the *Miller* factors. As a result, he argues that, as a similarly situated defendant, he is being denied equal protection of the law.

Neither *Miller* nor *Montgomery* delineate a fixed term of years, or an age on release from prison, that would be sufficient to provide a juvenile offender with a meaningful "opportunity for release." Indeed, in *Montgomer*y, the Court acknowledged that it was leaving to the states "the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 136 S. Ct. at 735 (alteration in original) (quoting *Ford v. Wainwright*, 477 U.S. 399, 416–17 (1986)). Thus, it falls to this Court to determine whether, under Idaho law, Shanahan's thirty-five year fixed sentence is tantamount to life without the opportunity for parole.

We recognize that, fifty years ago, this Court held that "sentences of thirty years or more must be treated *for purposes of parole eligibility* as effective life sentences." *King v. State*, 93

8

Idaho 87, 93, 456 P.2d 254, 260 (1969) (emphasis added). However, Idaho courts have since explicitly rejected efforts to define a life sentence as a determinate period of thirty years. *State v. Wood*, 125 Idaho 911, 913, 876 P.2d 1352, 1354 (1993) (rejecting defendant's argument that under *State v. King*, thirty years is a life sentence); *see also State v. Murphy*, 144 Idaho 152, 153, 158 P.3d 315, 316 (Ct. App. 2007) ("[U]nder Idaho law, a life sentence is not and never has been a thirty-year sentence, nor is there any 'custom and usage' making it so."). Further, the holding in *King* "no longer has precedential value in light of [Idaho's] adoption of the Unified Sentencing Act in 1986." *Wood*, 125 Idaho at 913, 876 P.2d at1354.

Shanahan offers persuasive authority from other states in which the courts have determined that life sentences for juveniles with determinate periods the same length or even shorter than thirty-five years equate to fixed-life sentences because they do not provide a meaningful opportunity for release. However, none of those cases involve juveniles convicted of homicide. In *State v. Pearson*, for example, a seventeen-year-old was sentenced to fifty years with thirty-five years fixed for two counts of first degree burglary and two counts of first-degree robbery. 836 N.W.2d 88, 89 (Iowa 2013). There, the court extended the principles of *Miller* to non-homicide offenses and required "an individualized sentencing hearing where, as here, a juvenile offender receives a minimum of thirty-five years imprisonment without the possibility of parole for these offenses and is effectively deprived of any chance of an earlier release and the possibility of leading a more normal adult life." *Id.* at 96. Yet, that conclusion was drawn in light of the court's belief that "it should be relatively rare or uncommon that a juvenile be sentenced to a lengthy prison term without the possibility of parole *for offenses like those involved in this case*." *Id.* (emphasis added); *see also State v. Houston-Sconiers*, 391 P.3d 409 (Wash. 2017) (involving robbery, conspiracy and assault charges).

Other cases Shanahan cites are similarly unavailing because the defendants were sentenced to much longer fixed terms, resulting in the potential for release at a significantly older age than Shanahan. *See State v. Null*, 836 N.W.2d 41, 45 (Iowa 2013) (*Miller* implicated where potential for release occurs after fifty-two years in custody, at the age of sixty-nine); *State v. Zuber*, 152 A.3d 197, 201 (N.J. 2017) (*Miller* implicated where potential for release occurs after sixty-eight years in custody, at the age of eighty-five); *Bear Cloud v. State*, 334 P.3d 132, 136 (Wyo. 2014) (*Miller* implicated where potential for release occurs after forty-five years in custody, at the age of sixty-one).

On the other hand, some state courts have determined that sentences similar to Shanahan's are not the equivalent of a life sentence. *See, e.g.*, *Middleton v. State*, 721 S.E.2d 111, 113 (Ga. Ct. App. 2011) (thirty years fixed for a fourteen-year-old defendant not a *de facto* life sentence); *Steilman v. Michael*, 407 P.3d 313, 320 (Mont.), *cert. denied*, 138 S. Ct. 1999 (2018) (effective sentence of thirty-one years fixed for seventeen-year-old defendant not a *de facto* life sentence); *State v. Sanders*, No. 2012AP1517, 2014 WL 3819456, at *1–3 (Wis. Ct. App. Aug. 5, 2014) (thirty-five years fixed for a fifteen-year-old defendant not a *de facto* life sentence). In a case that closely resembles Shanahan's, the Supreme Court of Wyoming recently held that, because the defendant received life with a fixed term of thirty-five years for first degree murder, and is eligible for parole when he is approximately fifty years old, his sentence "is not a *de facto* life sentence and does not violate the Eighth Amendment." *Sen v. State*, 390 P.3d 769, 777 (Wyo. 2017).

As a result of the trial court's sentence, Shanahan will be fifty years old when he becomes eligible for parole. Without any explanation or rationale as to why Shanahan would have an unusually short life expectancy, he argues that there is an "unacceptably high risk" that he will die in prison without being afforded an opportunity for release. However, even if he had provided any evidentiary support for this argument, we are inclined to follow the analysis in *Sen* and *Null* and decline to consider "specific projections of the defendant's life expectancy as a factor to be used in reviewing a juvenile's sentence," as we "[do] 'not believe the determination of whether the principles of *Miller* . . . apply in a given case should turn on the niceties of epidemiology, genetic analysis, or actuarial sciences in determining precise mortality dates.' " *Sen*, 390 P.3d at 776–77 (quoting *Null*, 836 N.W.2d at 71). Although Shanahan will be middle-aged when he becomes eligible for release, he still has a meaningful opportunity to obtain release—and much of his life ahead of him—if he can demonstrate that he is sufficiently rehabilitated and qualifies for parole. The Court is not satisfied that such a result is unjust under the circumstances of this case.[4]

For these reasons, we are disinclined to accept Shanahan's invitation to draw the line for a juvenile's fixed life sentence at thirty-five years or less. Accordingly, we hold that *Miller* does not apply and, thus, Shanahan's sentence does not violate the Eighth Amendment under *Miller*'s

---

[4] Indeed, there is a realistic possibility that if he lives a normal lifespan, Shanahan will spend a greater portion of his life in freedom than his victim, who was only 41 years old when he murdered her.

rationale. More importantly, because Shanahan did not receive a life sentence without the possibility of parole or the equivalent thereof, he is not "similarly situated" to those who have received such sentences, and thus, the alleged lack of consideration of the *Miller* factors in his case does not violate the Equal Protection Clause of the Fourteenth Amendment.

**C.      Shanahan's claim that his sentence is grossly disproportionate and otherwise violates the Eighth Amendment also fails.**

We next turn to Shanahan's argument that, even if he did not receive a *de facto* life sentence, his sentence is a cruel and unusual punishment in violation of the Eighth Amendment. Shanahan argues that, regardless of whether his sentence equates to a *de facto* life sentence, it violates the Eighth Amendment because it is "disproportionate given the attendant characteristics of youth present in this case."[5] As a result, he asks the Court to extend the rationale of *Miller* to all juvenile offenders who are prosecuted as adults, even where they are not sentenced to life without parole or its equivalent. The State alleges that Shanahan already raised similar arguments before the Court of Appeals in 1999, and therefore, he is barred under the doctrine of *res judicata* from arguing them again before this Court.

"*Res judicata* consists of claim and issue preclusion." *Smith v. Smith*, 164 Idaho 46, ___, 423 P.3d 998, 1002 (2018). "The question of whether an action is barred by res judicata is a question of law over which we exercise free review." *State v. Rhoades*, 134 Idaho 862, 863, 11 P.3d 481, 482 (2000). Regarding application of *res judicata* in the context of criminal law, we have stated:

> While this doctrine has traditionally been applied in the context of civil disputes, it is not foreign to criminal law. For example, in *State v. Beam*, 115 Idaho 208, 766 P.2d 678 (1988), *cert denied*, 489 U.S. 1073 (1989), this Court applied the principles of res judicata to a criminal defendant's attempts to raise the same issues previously ruled upon on direct appeal in a subsequent petition for post-conviction relief. *Id.* at 210–11, 766 P.2d 680–81.

*Id.*

This aspect of Shanahan's appeal raises a concern of claim preclusion, also known as "true *res judicata*." *Monitor Fin., L.C. v. Wildlife Ridge Estates, LLC*, 164 Idaho 555, ___, 433 P.3d 183, 188 (2019). As the Court of Appeals has explained,

---

[5] Shanahan concedes that his age, maturity, background, and mental health were considered as mitigating factors by the Court at sentencing; however, he suggests that the trial court's analysis would be more sharply focused on these issues if he were re-sentenced in the manner prescribed by *Miller*.

There are three requirements for the claim preclusive effects of res judicata to apply: (1) both actions must involve the same parties; (2) the claim alleged to be barred was presented in the first action or could have been raised; and (3) the first action resulted in a final judgment on the merits.

*State v. Martin*, 159 Idaho 860, 367 P.3d 255, 258 (Ct. App. 2016) (citing *Rhoades*, 134 Idaho at 863, 11 P.3d at 482); *see also State v. Wolfe*, 158 Idaho 55, 63, 343 P.3d 497, 505 (2015) ("[U]nder res judicata, a valid final judgment rendered on the merits is an absolute bar to a subsequent action between the same parties on the same claim."). Shanahan's 1999 appeal resulted in a final judgment and involved the same parties as those involved here, *i.e.*, Shanahan and the State of Idaho. *Shanahan*, 133 Idaho at 896, 994 P.2d at 1059. Thus, the only remaining issue is whether the "same claim" element of *res judicata* is satisfied.

"[T]he 'transactional concept of a claim is broad.' " *Smith*, 164 Idaho at ___, 423 P.3d at 1003 (quoting *Ticor Title Co. v. Stanion*, 144 Idaho 119, 126, 157 P.3d 613, 620 (2007)). As a result, "claim preclusion 'may apply even where there is not a substantial overlap between the theories advanced in support of a claim, or in the evidence relating to those theories.' " *Id.* (quoting *Ticor Title Co.*, 144 Idaho at 126, 157 P.3d at 620). Here, Shanahan's argument that his sentence violates the Eighth Amendment is, in essence, the same as what he submitted to the sentencing court in his Rule 35 Motion and to the Court of Appeals in 1999.

In Shanahan's 1997 Rule 35 motion requesting that the court reduce his sentence, he stated:

> The herein motion is made on the grounds and for the reasons that the sentence imposed for First Degree Murder in the . . . matter is excessive and unreasonable. The herein motion is made on the further grounds and for the further reasons that the sentence imposed is grossly disproportionate and is out of proportion to the gravity of the offense committed and constitutes cruel and unusual punishment . . . . The herein motion is made on the further grounds that because of the defendant's age at the time of the offense (15 years of age) and the fact that the Court sentenced the defendant as an adult pursuant to I.C. § 20-509, the sentencing goals of protection of society, deterrence, rehabilitation and retribution, should be modified to include consideration of the best interests of the child.

When the motion was denied, Shanahan appealed. The issues on appeal were presented as follows:

> A.    The Appellant should have been sentenced in accordance with the juvenile sentencing options set forth in the Juvenile Corrections Act.

12

B.     The sentence imposed on the Appellant for the First Degree Murder charge is excessive, unreasonable, grossly disproportionate and out of proportion to the gravity of the offense committed.

C.     The sentence imposed for First Degree Murder constitutes cruel and unusual punishment in violation of the Appellant's rights guaranteed by the 8th Amendment to the United States Constitution and as guaranteed by Article I, § 6 of the Constitution of the State of Idaho.

D.     The sentencing goals of protection of society, deterrence, rehabilitation, and retribution should have been modified to include consideration of the best interests of the Appellant (who was 15 years of age at the time of the charged offenses).

In addressing his arguments, the Court of Appeals concluded:

> Shanahan argues that the district court should have given greater consideration to his age, his immaturity, and his mental condition. When it imposed the sentences in this case, the district court specifically considered the testimony of Dr. Heinbecker, a psychiatrist, who testified during the sentencing hearing. As the district court set forth in its sentencing memorandum, Dr. Heinbecker stated that Shanahan's thinking was "immature and uninformed" and that Shanahan had "no comprehension of the gravity of killing someone." According to Dr. Heinbecker, Shanahan, at the time of sentencing, still did not fully appreciate the seriousness of the crime. The district court also specifically noted Shanahan's life history—his parents' divorce, his lack of a role model and his low self-esteem. Finally, the district court noted that, although Shanahan was suffering from depression at the time of the crime, he was capable of distinguishing between right and wrong and had the ability to conform his behavior to societal standards.
>
> . . . .
>
> Although the sentences in the instant case are severe, the Court cannot hold that they are excessive under any reasonable view of the facts.

*Shanahan*, 133 Idaho at 901–02, 994 P.2d at 1064–65. Because his argument before this Court is in substance a reiteration of his earlier argument before the sentencing court and the Court of Appeals, we hold that this claim is foreclosed by the doctrine of *res judicata*.

Further, even if Shanahan presented a new argument in light of "changes in the legal landscape," as he asserts, his argument fails for several reasons. Concerning the Eighth Amendment, the U.S. Supreme Court explained in *Miller*:

> The Eighth Amendment's prohibition of cruel and unusual punishment guarantees individuals the right not to be subjected to excessive sanctions. That right, we have explained, flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense. As we noted the last time we considered life-without-parole sentences

imposed on juveniles, the concept of proportionality is central to the Eighth Amendment. And we view that concept less through a historical prism than according to the evolving standards of decency that mark the progress of a maturing society.

567 U.S. at 469–70 (internal citations and quotations omitted). In assessing whether a sentence violates the Eighth Amendment, "[a] court must begin by comparing the gravity of the offense and the severity of the sentence." *Graham*, 560 U.S. at 60.

> "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions.

*Id.* (quoting *Harmelin v. Michigan*, 501 U.S. 957, 960 (1991)).[6] "If this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' the sentence is cruel and unusual." *Id.* (quoting *Harmelin*, 501 U.S. at 1005).

Although Shanahan seeks to extend *Miller* to all juvenile offenders sentenced as adults, *Miller* only held that imposing the *harshest* possible sentence on a juvenile homicide offender without consideration of youth and its attendant characteristics poses a risk of violating the Eighth Amendment. *Miller*, 567 U.S. at 479 ("By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment."). Thus, it does not follow from the logic of *Miller* that every youth who is sentenced as an adult is entitled to consideration of the *Miller* factors.

Moreover, this is not the "rare case" in which a threshold comparison of the gravity of the offense and the severity of the sentence leads to an inference of gross disproportionality. Shanahan committed a senseless, premeditated murder and a robbery that resulted in his sentence of concurrent unified life terms, with thirty-five years fixed for the murder and ten years fixed for the robbery. Given the gravity of his charged crimes and the heinous manner in which they were committed, it is quite a legal stretch for Shanahan to describe his sentence as being "far beyond excessive."

---

[6] Shanahan attempts to evade application of the *Harmelin* disproportionality test by arguing that in *Miller*, the Court "brushed aside strict adherence to [*Harmelin*'s] longstanding disproportionality test." In *Miller*, the Court said, "*Harmelin* had nothing to do with children, and did not purport to apply to juvenile offenders. Indeed, since *Harmelin*, this Court has held on multiple occasions that sentencing practices that are permissible for adults may not be so for children." 132 S. Ct. at 2459. However, Shanahan takes this language out of context. The *Miller* Court was not rejecting application of *Harmelin* in its entirety, but merely rejecting the State's argument that *Harmelin* "forecloses a holding that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." *Id.* Thus, application of the *Harmelin* disproportionality test is appropriate in this case.

14

Finally, even if this was the rare case where an initial comparison led us to believe that Shanahan's sentence is grossly disproportionate in light of the crimes he committed, a review of other sentences for homicide crimes committed by juveniles in this jurisdiction and others demonstrates that Shanahan's sentence is not excessive, and accordingly, does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. *See, e.g.*, *Adamcik v. State*, 163 Idaho 114, 130, 408 P.3d 474, 490 (2017), *cert. denied*, 138 S. Ct. 1607 (2018) (no Eighth Amendment violation for juvenile's sentence of life without parole for homicide); *Johnson v. State*, 162 Idaho 213, 226, 395 P.3d 1246, 1259, *cert. denied*, 138 S. Ct. 470 (2017) (no Eighth Amendment violation for juvenile's sentence of life without parole for homicide); *Brown v. Hobbs*, No. CV-13-1116, 2014 WL 2566091, at *6 (Ark. June 5, 2014) (no Eighth Amendment violation for juvenile's sentence of life without parole for homicide); *James v. United States*, 59 A.3d 1233, 1239 (D.C. 2013) (no Eighth Amendment violation for juvenile's sentence of life with thirty years fixed for homicide); *State v. Vang*, 847 N.W.2d 248, 262 (Minn. 2014) (no Eighth Amendment violation for juvenile's sentence of life with thirty years fixed for homicide); *State v. Houston*, 353 P.3d 55, 62 (Utah 2015) (no Eighth Amendment violation for juvenile's sentence of life without parole for homicide); *Sen*, 390 P.3d at 772 (no Eighth Amendment violation for juvenile's sentence of life with thirty-five years fixed for homicide). Notably, Shanahan cited no cases holding that an indeterminate life sentence with thirty-five years fixed, even for a juvenile, is disproportionate to a homicide offense.

In sum, we hold that *res judicata* bars Shanahan's claim, and even if it did not, his argument that his sentence is grossly disproportionate is without merit.

## V.    CONCLUSION

We affirm the decision of the district court denying Shanahan's Rule 35 motion.

Chief Justice BURDICK, and Justices BEVAN and STEGNER **CONCUR**.


BRODY, Justice, concurring in the result, but dissenting in Parts A and B of the analysis.

I respectfully dissent from the Court's decision to expand the U.S. Supreme Court's holding in *Miller v. Alabama*, 567 U.S. 460 (2012). I agree that the Supreme Court's decision in *Miller* required this Court to re-examine fixed life sentences for juvenile offenders convicted of homicide in cases where the imposition of the sentence was discretionary on the part of the trial

15

court. *See, e.g., Adamcik v. State*, 163 Idaho 114, 130, 408 P.3d 474, 490 (2017); *Windom v. State*, 162 Idaho 417, 423, 398 P.3d 150, 156 (2017); *Johnson v. State*, 162 Idaho 213, 226, 395 P.3d 1246, 1259 (2017). I am unpersuaded that *Miller's* constitutional constraint on a life sentence for a juvenile extends to indeterminate sentences that are the "functional equivalent" of a fixed life sentence. *Miller* applies only to fixed life sentences. I agree with the Court's decision to affirm the district court in this case, but would not start down the path of using the Eighth Amendment to re-examine lengthy indeterminate sentences for juveniles convicted of homicide.